## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

AU HEALTH SYSTEM, INC., AU
MEDICAL CENTER, INC. and AU
MEDICAL ASSOCIATES, INC.,

     Plaintiffs,

v.

AFFILIATED FM INSURANCE
COMPANY,

     Defendant.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, AU Health System, Inc., AU Medical Center, Inc. and AU Medical Associates, Inc. ("Plaintiffs" or "AU Entities"), by and through their undersigned counsel, bring this Complaint for damages and declaratory judgment against Defendant, Affiliated FM Insurance Company ("AFM"), respectfully alleging as follows:

## I.   NATURE OF ACTION.

Plaintiffs bring this action for breach of contract, declaratory judgment and bad faith arising out of Plaintiffs' claim for insurance coverage under an All Risk Insurance Policy that AFM sold to Plaintiffs. As part of the Policy (as defined below), AFM is required to cover Plaintiffs' Property (as defined below) against all

risks of physical loss or damage, except as specifically excluded within the Policy. AFM is also required to cover Plaintiffs' resulting business interruption loss, including business interruption losses from the presence of communicable disease, closure of the Plaintiffs' facilities because of civil authority orders, as described in Sections E.2 and E.3 of the Policy (collectively, "Civil Authority Orders") and officer orders, as described in Sections D.5 and E.3 of the Policy (collectively, "Officer Orders").  (*See* Policy, Sec. D.5, p. 7 of 44; E.2, p. 24 of 44; E.3, p. 25 of 44.)

1.

Beginning in March 2020, Plaintiffs' Property began to suffer damage as Plaintiffs' business operations were severely interrupted by the actual presence of SARS-COV-2 ("COVID-19") at Plaintiffs' locations.  In addition, Plaintiffs' clinical healthcare services and operations, which are the essence of Plaintiffs' business, were severely disrupted beginning in March 2020 by the presence of communicable disease and the resulting imposition of various Civil Authority Orders and Officer Orders of Plaintiffs that closed and hampered various services that Plaintiffs' various healthcare services provide to the community.  The COVID-19 pandemic continued to interrupt the operations of Plaintiffs through and including the date of this Complaint.  It also has caused Plaintiffs to incur enormous expenses that are covered

by the Policy because of the actual presence of COVID-19, which is a communicable disease the Policy specifically covers.

2.

As detailed further herein, in April 2020, Plaintiffs provided the initial Sworn Statement of Notice of Claim of Loss to AFM.   On June 9, 2020, Plaintiffs supplemented the Claim of Loss.  On June 24, 2020, without explanation Defendant AFM rejected the Claim of Plaintiffs.   Nevertheless, Plaintiffs provided further supplementation of the Claim on July 20, 2020.  Defendant AFM again rejected that Claim without adequate justification or explanation on August 4, 2020.  As a result, Plaintiffs bring this action for damages, declaratory judgment and recovery under O.C.G.A. § 33-4-6 for the bad faith conduct of AFM.

## II.   **PARTIES.**

3.

Plaintiff AU Health System, Inc. ("AUHS") is a Georgia not-for-profit corporation.   It is the sole member for not-for-profit purposes of Plaintiff AU Medical Center, Inc. ("AUMC").  It also is the sole member of Plaintiff AU Medical Associates, Inc. ("AUMA").  AUHS provides important guidance and direction to AUMC and AUMA, in the delivery of various healthcare services to the community.

3

4.

Plaintiff AUHS' principal place of business is located at 1120 15th Street, Augusta, Georgia 30912.

5.

Plaintiff AUMC is a Georgia not-for-profit corporation.  It is an academic medical center offering comprehensive primary, specialty and subspecialty care to residents of Augusta, Georgia and surrounding areas, including South Carolina.  It operates a 478-bed adult acute-care hospital, 154-bed children's hospital and more than 80 outpatient practice sites.  AUMC offers the full range of hospital services to the community and is the region's only Level I trauma center and only Level II pediatric trauma center.   Its primary hospital campus is located in the area immediately surrounding 1120 15th Street, Augusta, Georgia 30912.

6.

Plaintiff AUMA is a Georgia not-for-profit corporation.  AUMA is the faculty practice plan for physicians who are faculty members of the Medical College of Georgia, the medical college that is affiliated with AUMC.  AUMA is comprised of approximately 485 physicians in 95 subspecialties who practice at the primary hospital campus of AUMC, and various off-campus locations of AUMA and AUMC.  AUMA's principal place of business is 1499 Walton Way, Suite 1400, Augusta, Georgia 30901.

4

7.

Affiliated FM Insurance Company ("AFM") is incorporated under the laws of Rhode Island with a principal place of business at 270 Central Avenue, Johnston, Rhode Island 02919.  AFM has an office and regularly conducts business at its location at 3460 Preston Ridge Road, Suite 400, Alpharetta, Georgia 30005.

## III.   **JURISDICTION AND VENUE.**

8.

This court has subject matter jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the Parties.

9.

AFM is subject to the personal jurisdiction of the Court because AFM routinely conducts business in the State of Georgia.  In addition, the Policy covers Property in the State of Georgia and all of the events giving rise to the claim of Plaintiffs that AFM has denied in bad faith took place in Augusta, Georgia.  AFM delivered the Policy to Plaintiffs in Augusta, Georgia.

10.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), which states, "[a] civil action may be brought in a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is

located."  28 U.S.C. § 1391(b)(1).  Further, "an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* at (c)(2).  Because AFM is subject to personal jurisdiction in this district, it resides in this district, and venue is appropriate.

## IV.   FACTUAL BACKGROUND AND THE POLICY THAT AFM SOLD TO PLAINTIFFS.

11.

AFM is an insurance company that sold an insurance policy providing coverage to AUHS, and its affiliates AUMC and AUMA, against all risks of physical loss or damage, except as the Policy specifically excludes (the "Policy").  A true and accurate copy of the Policy is attached hereto as Exhibit 1.

12.

The Policy had a policy period of July 1, 2019 through June 30, 2020, which was renewed for a policy period of July 1, 2020 through June 30, 2021.

13.

The Policy insures the following property of the insured (collectively, the "Property"), unless otherwise excluded elsewhere in the Policy:

1. Real Property in which the Insured has an insurable interest.
2. Personal Property:

a) Owned by the Insured.
b) Consisting of improvements and betterments in which the Insured has an insurable interest.
c) Of directors, officers and employees of the Insured.
d) Of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.
e) Of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to such Personal Property.

Policy, Sec. A at p. 1 of 44.

14.

The Policy also provides property damage coverage related to communicable disease.  In relevant part, the Policy states:

If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:

a) An order of an authorized governmental agency regulating or as result of such presence of communicable disease; or
b) A decision of an Officer of the Insured as a result of such presence of communicable disease,

This Policy covers the reasonable and necessary costs incurred by the Insured at such described location for the:

a) Cleanup, removal and disposal of such presence of communicable disease from insured property; and
b) Actual costs or fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from such presence of communicable disease on insured property.

Policy, Sec. D.5, p. 7 of 44.

15.

The Policy covers multiple locations of AUMC and AUMA including the main hospital campus of AUMC, various outpatient locations of AUMC and AUMA and an outpatient surgery center.  (*See* Declarations, Sec. H.3.)

16.

Defendant AFM drafted the Policy and sold it to Plaintiffs after soliciting Plaintiffs' business.

17.

The Policy also provides for the recovery of gross earnings stemming from an interruption of the insured's business.  The Policy states:

> The recoverable Gross Earnings loss payable is limited to the extent the Insured is:
>
> (a) Wholly or partially prevented from producing goods or continuing business operations or services;
> (b) Unable to make up lost production within a reasonable amount of time, not limited to the period during which the production is interrupted;
> (c) Unable to continue such operations or services during the Period of Liability; and
> (d) Able to demonstrate a loss of sales for the production or business operations or services prevented.

Policy, Sec. B.1, p. 20 of 44.

18.

The Policy also provides for recoverable "Gross Profits Loss" which is the "actual loss sustained by the Insured of reduction of sales and increased cost of doing business, resulting from the necessary interruption of business during the period of liability." (*Id.* at Sec. B.2., p. 20 of 44.)

19.

Additionally, the Policy includes "extensions" which extend the business interruption coverage under certain circumstances. Two such extensions are "Civil or Military Authority" and "Communicable Disease," each of which is described in greater detail below. The Policy also provides an Extended Period of Liability, which extends the time period used in the calculation of lost earnings to cover an additional length in time that is required to restore the insured's business operations to the condition that would have existed had the loss not occurred. (*See* Declarations, Sec. F.)

20.

The Policy also extends business interruption coverage to instances where Plaintiffs' business is interrupted by the actions of a civil or military authority. Specifically, the Policy states:

> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability if an order of civil or military authority prohibits access to a location provided such order is the direct result of physical damage of the type insured at a location or within five

(5) statute miles of it.  Item B. 3. of Property Excluded does not apply to this Business Interruption Coverage Extension.

The Period of Liability for this Business Interruption Coverage Extension will be:

> (a) The period of time starting at the time of such order of civil or military authority, but not to exceed the number of consecutive days shown in the Declarations section of this Policy.

Policy, Sec. E.2, p. 24 of 44.

### 21.

The Policy also extends business interruption coverage to interruptions caused by the presence of communicable disease.  Specifically, the Policy states:

> If a described location owned, leased or rented by the Insured has the actual not suspected presence of communicable disease and access to such described location is limited, restricted or prohibited by:
>
> > (a) An order of an authorized governmental agency regulating such presence of communicable disease; or
> > (b) A decision of an Officer of the Insured as a result of such presence of communicable disease,
>
> This Policy covers the Business Interruption Coverage loss incurred by the Insured during the Period of Liability at such described location with such presence of communicable disease.

Policy, Sec. E.3, p. 25 of 44.

### 22.

The Policy also provides an Extended Period of Liability of 365 days, which provides an additional period of time in which business interruption coverage is

10

provided.  (*See* Declarations, Sec. F.)  This extends the time period used in the calculation of lost earnings to cover an additional length of time that is required to restore the insured's business operations to the condition that would have existed had the loss not occurred.  (*See* Declarations, Sec. F.)

## V.    CONDITIONS MANDATING COVERAGE OF LOSSES INCURRED BY PLAINTIFFS AT PLAINTIFFS' VARIOUS LOCATIONS.

23.

During the Period of Liability (as defined by the Policy) COVID-19 was present at Plaintiffs' locations insured by the Policy.

24.

COVID-19 is a "communicable disease" under the Policy.

25.

Pursuant to the Policy, to claim a loss for property damage or business interruption coverage related to communicable disease, a "location owned, leased or rented by the insured" must have the "actual not suspected presence of communicable disease."  (*See* Exhibit 1, Sec. E.3., p. 25 of 44.)

26.

COVID-19 is a deadly, highly-communicable disease that has infected more than more than 26 million people in the United States and at least 917,440 in the State of Georgia and 447,904 in the State of South Carolina.  CDC, *COVID Data*

*Tracker*, accessed February 3, 2021, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days.

27.

COVID-19 is spread mainly from person to person, through the air by coughing, sneezing, and talking.  Accordingly, the disease has spread easily, continuously and sustainably in the communities that Plaintiffs serve.

28.

By March 12, 2020, the State of Georgia reported its first statistic from COVID-19 and thirty-one (31) positive test results.  Yeung, *et seq.*, *March 12 Coronavirus News*, CNN, https://www.cnn.com/world/live-news/coronavirus-outbreak-03-12-20-intl-hnk/h_1df1e002c78d812fa27b863c15830ecc.           On March 13, 2020, President Trump declared a National Emergency.  WHITE HOUSE.GOV, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  Only three months after the first death from COVID-19 in Georgia, Georgia had approximately 47,000 confirmed cases, over 2,000 deaths, almost 8,000 hospitalizations and almost 1,800 ICU admissions related to COVID-19.  GA DEPT. OF PUBLIC HEALTH, *Health Daily Status Report*, https://dph.georgia.gov/covid-19-daily-status-report, accessed

May 30, 2020.  On that same date, the State of South Carolina had 11,861 positive test results and 494 deaths.  SC DEPT. OF HEALTH AND ENVIRONMENTAL CONTROL, *SC Testing Data & Projections (COVID-19)*, https://www.scdhec.gov/infectious-diseases/viruses/coronavirus-disease-2019-covid-19/sc-testing-data-projections-covid-19, accessed May 31, 2020.

29.

These numbers have spiraled upward with at least 759,228 confirmed molecular cases in Georgia as of February 3, 2021, including at least 17,185 confirmed cases in Richmond County and 9,775 confirmed cases in Columbia County alone.  GA DEPT. OF PUBLIC HEALTH, *Daily Status Report,* https://dph.georgia.gov/covid-19-daily-status-report, accessed January 29, 2021.  As of February 3, 2021, at least 50,953 COVID-19 positive patients had been hospitalized in the State of Georgia, with at least 12,907 confirmed deaths. *Id*. As of the date of this Complaint, Plaintiffs had treated over 1,680 patients requiring hospitalization at AUMC because of COVID-19.

30.

There have been numerous COVID-19 patients hospitalized at AUMC since mid-March and hundreds of staff members and employees working at Plaintiffs' insured locations who also tested positive for COVID-19.  In the Second Supplement to Sworn Statement of Notice of Claim of Proof of Loss, dated July 20, 2020, AUMC

13

provided clear evidence to AFM of the actual presence of COVID-19 at Plaintiffs'

locations.  A true and correct copy of the First Supplement to Sworn Statement of

Notice of Claim of Proof of Loss is attached hereto as Exhibit 2 (with Exhibit L

thereto removed because of volume of same).  A true and correct copy of the Second

Supplement to Sworn Statement of Notice of Claim of Proof of Loss is attached

hereto as Exhibit 3.

31.

The following locations are owned and/or operated by the Plaintiffs, insured under the Policy and have been damaged in connection with the claims described herein:

i.    1120 15th Street, 1440, 1453, 1466 & 1477 Harper Street and 1481 Laney Walker Boulevard, Augusta, GA, 30912

ii.    1411 & 1417 Laney Walker Boulevard and 997 Saint Sebastian Way, Augusta, GA, 30912

iii.    821 Saint Sebastian Way, Augusta, GA, 30912

iv.    935 15th Street, Augusta, GA, 30912

v.    1515 Pope Avenue, Augusta, GA, 30904

vi.    815 Saint Sebastian Way, Augusta, GA, 30912

vii.    1003 Chafee Avenue, Augusta, GA, 30904

viii.    1225 Walton Way, Augusta, GA, 30901

ix.    905 15th Street, Augusta, GA, 30901

x.    810-812 Chafee Avenue, Augusta, GA, 30904

xi.    821 15th Street, Augusta, GA, 30901

xii.    827 15th Street, Augusta, GA, 30901

xiii.    1512 Pope Avenue, Augusta, GA, 30904

xiv.    1556 Walton Way, Augusta, GA, 30904

xv.    841 Chafee Avenue, Augusta, GA, 30904

xvi.    939 15th Street, Augusta, GA, 30901

xvii.    One 10th Street, Augusta, GA, 30901

xviii.    4300 University Pkwy, Evans, GA, 30809

xix.    1348 Walton Way, Augusta, GA, 30901

xx.    2011 Westend Drive, Greensboro, GA, 30642

xxi.    3152 Washington Road, Augusta, GA, 30907

xxii.    1220 West Wheeler Parkway, Augusta, GA, 30909

xxiii.    2834 Hillcreek Drive, Augusta, GA, 30909

xxiv.    118 Park Avenue SW, Aiken, SC, 29801

xxv.    901 Magnolia Drive, Aiken, SC, 29803

xxvi.    3324 Peach Orchard Road, Suite A, Augusta, GA, 30906

xxvii.    557 Furys Ferry Road, Martinez, GA, 30907

xxviii.    587 Furys Ferry Road, Martinez, GA, 30907

xxix.    417 Lewiston Road, Suite 5, Grovetown, GA, 30813

xxx.    303 W. Robinson Avenue, Grovetown, GA, 30813

xxxi.    4244 Washington Road, Suite A, Evans, GA, 30809

xxxii.    1417 Pendleton Road, Augusta, GA, 30904

The insured locations of Plaintiffs set forth above experienced the actual presence

of COVID-19.  Patients exhibiting symptoms of COVID-19 began to present for

treatment at AUMC and AUMA locations on approximately March 13, 2020.  As a major healthcare network serving east central Georgia and west central South Carolina, Plaintiffs were on the forefront of treating patients infected by the deadly COVID-19 virus.  In addition, for the Property locations in Georgia, AUHS was the only healthcare provider appointed by Executive Order to screen and treat COVID-19 patients.  (*See* Exhibit 3 hereto, at Exhibit C.)  During the Period of Liability (as defined in the Policy), Plaintiffs tested tens of thousands of patients for COVID-19 and treated over a thousand confirmed COVID-19 patients as inpatients and observation cases.  This had an immediate and devastating impact upon the Property and business operations and healthcare services of Plaintiffs.

## VI.   EXISTENCE OF CIVIL, MILITARY AND GOVERNMENTAL ORDERS BECAUSE OF COVID-19 AND RELATED PHYSICAL LOSS OR DAMAGE TO PROPERTY OF PLAINTIFFS.

32.

The Policy covers business interruption loss resulting from certain orders issued by a civil or military authority that is the "direct result of physical damage of the type insured."  (*See* Policy, Exhibit 1 hereto, Section E.2.)  Conversely, the Policy covers business interruption and property damage loss resulting from a communicable disease when (1) "an authorized governmental agency" issues an "Order" regulating (or for property damage, resulting from) "the presence of

communicable disease," or (2) a decision of an officer is issued.  (*See* Exhibit 1, at

Sections D.5., E.2. and E.3.)

33.

In an effort to slow the spread of COVID-19, and as a result of physical

damage caused by COVID-19, the federal government and Georgia and South

Carolina state governments and local governments imposed numerous orders to

protect the public.

34.

COVID-19 was present at Property insured by the Policy and the surrounding

five (5) miles.

35.

In response to COVID-19, Georgia Governor Kemp issued an Executive

Order declaring a Public Health State of Emergency on March 14, 2020.  (*See*

Exhibit D to Supplemental Sworn Statement of Notice of Claim of Proof of Loss,

attached hereto as Exhibit 2.)  The State of Georgia renewed the Public Health State

of Emergency on April 8, 2020 pursuant to Executive Order 04-08-20.02 and

April 30, 2020 pursuant to Executive Order 04-30-20.01.  In connection with the

Public Health State of Emergency, all hospitals, healthcare facilities and medical

personnel were required to fully comply with all Orders issued by the Governor.

36.

On March 23, 2020, with the number of COVID-19 cases in Georgia rising sharply, the Georgia Governor published a second Executive Order, requiring all high-risk populations to shelter in place and prohibiting the gathering of more than ten persons in any location or persons within six feet of one another.  (*See* Exhibit G to Supplement to Sworn Statement of Notice of Claim of Proof of Loss, attached hereto as Exhibit 2.)

37.

On April 2, 2020, the Shelter-in-Place Order was expanded to a statewide Shelter-in-Place Order requiring all residents and visitors of the State of Georgia to shelter in place in their homes or places of residence and take "every possible precaution to limit social interaction to prevent the spread or infection of COVID-19 to themselves or any other person."

38.

More than one month after declaring the Public Health State of Emergency, on April 20, 2020, the Georgia Governor renewed the Order prohibiting individuals from gathering in groups of more than ten persons in a location or persons within six feet of one another.  (*See* Exhibit 2 hereto, at Exhibit C.)

39.

Additionally, this Executive Order explained that the Georgia Department of Public Health had entered into an agreement with AUHS through which AUHS would "provide COVID-19 screening and testing services for residents and visitors of the State of Georgia."  *Id.*  For these purposes, AUHS would be considered an agent of the State and such services would be "considered acts in accordance with an Order entered into by the Governor."  *Id.*

40.

Three days later, the Governor issued an Executive Order renewing the Shelter-in-Place Order for high-risk individuals, renewing the Order to social distance, prohibiting gatherings of more than ten persons in a location or persons within six feet of one another and encouraging all residents and visitors of Georgia to wear face coverings when outside.  The April 23, 2020 Executive Order also required that critical infrastructure, including persons and entities delivering healthcare services like Plaintiffs, implement measures to mitigate the exposure and spread of COVID-19.

41.

On June 29, 2020, the Georgia Governor again renewed the Public Health State of Emergency to August 11, 2020.  In declaring this Order, Governor Kemp explained that there still exists a continued need for protecting vulnerable

populations and providing comprehensive testing for COVID-19.   (*See* Second Supplement, Exhibit 3 hereto, at Exhibit K.)   More recently, the Georgia Governor again renewed the Public Health State of Emergency to January 29, 2021.

42.

Likewise, there were issued multiple Orders by the South Carolina Governor. On March 13, 2020, the South Carolina Governor declared a State of Emergency and took measures to mitigate the exposure of COVID-19.   (*See* Exhibit 2 hereto, at Exhibit K.)   The State of Emergency was later renewed on March 28, 2020 pursuant to Executive Order No. 2020-15 and April 12, 2020 pursuant to Executive Order No. 2020-23.   (*See* Exhibit 2 hereto, at Exhibits L & M.)

43.

Six days after initially declaring the State of Emergency, the Governor issued a new Executive Order prohibiting all non-essential workers from reporting to work physically or in person.   (*See* Exhibit 2 hereto, at Exhibit N.)

44.

On March 21, 2020, the Governor directed all individuals to practice social distancing throughout the state.   (*See* Exhibit 2 hereto, at Exhibit O.)

45.

On March 28, 2020, the State of Emergency was renewed pursuant to Executive Order 2020-15.   (*See* Exhibit 2 hereto, at Exhibit L.)

46.

On April 6, 2020, the Governor issued a Shelter-in-Place Order for all individuals except those engaged in essential business, essential activities or critical infrastructure operations but as to those operations, the Order required that individuals "to the maximum extent possible, to further promote social distancing, facilitate self-isolation and otherwise prevent exposure to COVID-19." (*See* Exhibit 2 hereto, at Exhibit P.) "Any individual leaving his or her residence was restricted to maintain at least six feet of separation." These Executive Orders in and of themselves were issued regarding and directly resulting from COVID-19, which damaged Plaintiffs' Property and caused Plaintiffs to suffer tens of millions of dollars in losses. Each Executive Order that was set forth expressly references COVID-19, and each was published in an attempt to mitigate the damage caused by COVID-19.

## VII.   DECISIONS OF OFFICERS OF THE PLAINTIFFS ISSUED AS A RESULT OF THE PRESENCE OF COVID-19.

47.

Beginning in March 2020, AUMC began treating patients who tested positive for COVID-19 in the hospital. AUMC treated:

     a.  17 admitted hospital patients in March 2020;

     b.  55 admitted hospital patients in April 2020;

     c.  59 admitted hospital patients in May 2020;

d.  86 admitted hospital patients in June 2020;

e.  225 admitted hospital patients in July 2020; and

f.  242 admitted hospital patients in August 2020.

48.

Further, AUMC treated hundreds of patients in its emergency room who were not admitted for treatment.

49.

AUMC and AUMC also treated hundreds of patients in outpatient clinics.

50.

To cover a loss from property damage or business interruption from the communicable disease, (1) a "decision of an officer of the insured" must be issued "as a result of such presence of communicable disease," or (2) an authorized governmental agency must issue an order, which Plaintiffs describe in detail, *infra*, at Paragraph Nos. 51-59.

51.

Officers of AUHS, AUMC and AUMA issued multiple orders and policies related to COVID-19 because of the actual presence of COVID-19 at Property of Plaintiffs that AFM agreed to insure.

52.

To prevent non-COVID-19 patients from contracting the disease, Executive Vice-President and Chief Medical Officer of AUMC, Phillip Coule, M.D., issued an Officer Order instituting extensive visitor policies and screening processes. (*See* Exhibit 2 hereto, at Exhibit Q.)  Not only were intensive screening processes set forth but only one family member was allowed to accompany patients, except in the case of COVID-19 patients who were not permitted to have a companion unless the patient was a minor or laboring mother. (*Id.* at Exhibits R & S.)

53.

Effective April 3, 2020, these restrictions were expanded, and adult patients were prohibited from having any family or guests in any adult patient care area. (*See* Exhibit 2 hereto, at Exhibit T.)  These Officer Orders, in conjunction with Executive Orders, prohibiting and limiting access to various facilities because of the presence of COVID-19, resulted in significant business interruption for AUHS, AUMC and AUMA.

54.

Plaintiffs also issued Officer Orders requiring all patients who might have come into contact with COVID-19 to be physically isolated.  Each time a COVID-19 test was ordered, the AUHS system automatically generated isolation orders for the patient, which included (1) contact isolation, (2) droplet isolation, (3) a droplet

isolation count, and (4) nursing education rules for contact and droplet isolation. (*See* Exhibit 2 hereto, at Exhibit V.)  Even before a COVID-19 test could be ordered, all patients with COVID-19 consistent symptoms requiring admission had to be isolated, and those with severe acute respiratory distress placed in "airborne isolation," which required the use of airborne-infection isolation rooms.  (*See* Exhibit 2 hereto, at Exhibit W.)  Also, airborne-infection isolation rooms had to be used where possible during and after the intubation of all critically ill patients who were presumed to be COVID-19 positive.  (*See* Exhibit 2 hereto, at Exhibit X.)

55.

Officer Orders were also issued suspending elective surgery at AUMC, because of the presence of COVID-19 at AUMC and AUMA locations, the danger to patients, employees and physicians at AUMC, danger to property, risk of infection and related calamities.  (*See* Exhibit 2 hereto, at Exhibit Y.)  On March 21, 2020, the suspension was extended to April 13, 2020.  (*See* Exhibit 2 hereto, at Exhibit Z.)  Then on April 6, 2020, Dr. Coule issued another Executive Order extending the suspension of elective surgery and requiring extraordinary testing measures to be performed respecting any non-elective surgery.  (*See* Exhibit 2 hereto, at Exhibit AA.)  This Officer Order directly impacted the main procedural areas for AUMC and AUMA, including but not limited to the main operating rooms at AUMC, Children's Hospital of Georgia operating rooms, Surgery Center of

24

Columbia County operating rooms, Interventional Radiology, Cardiac Catheterization Lab and Electrophysiology Lab, Digestive Health and Bronchoscopy, the Pain Clinic and office and clinic-based elective procedures. (*See* Exhibit 2 hereto, at Exhibit AA.)

56.

In addition to testing, isolation and suspension of elective surgery, Plaintiffs issued numerous Officer Orders allocating personnel and resources to fight against COVID-19. This reallocation of resources and medical personnel not only interrupted the production of revenue but such individuals following treatment of COVID-19 patients had to be provided time-off and were therefore unable to generate revenue customarily generated. (*See* Exhibit 2 hereto, at Exhibit AB.)

57.

Officer Orders also required self-quarantining of employees who believed they were exposed to COVID-19. Employees who tested positive for COVID-19 had to remain in isolation pursuant to CDC guidelines. Officer Orders with respect to all of the necessary quarantining and isolation that was required because of the actual presence of COVID-19 diminished Plaintiffs' workforce, reduced revenue and resulted in additional catastrophic financial loss to the Plaintiffs. (*See* Exhibit 2 hereto, at Exhibits AC & AD and Exhibit W.)

58.

On July 28, 2020, Dr. Coule issued another Officer Order activating an emergency plan because of the escalating spike in COVID-19 cases.  This Officer Order required and permitted the reallocation of physicians, advanced practitioners, and nursing and other clinical staff from outpatient locations to treat COVID-19 patients as necessary.

59.

Pursuant to Civil Authority Orders and Officer Orders, access to the locations of Plaintiffs was limited, restricted or prohibited.  Not only does this give rise to a claim of loss for property damage, but also a claim of loss for business interruption from a civil or military authority.  (*See* Exhibit 1 hereto, at Sections D.5., E.2. and E.3.)

60.

Beginning on March 13, 2020, the Plaintiffs were limited, restricted and prohibited from accessing numerous of Plaintiffs' locations and suffered a loss as a result.  In response to the Executive Orders, Officers Orders and the actual presence of COVID-19 at locations of Plaintiffs, the Plaintiffs had to enforce isolation, social distancing and mitigation measures which limited, restricted and prohibited access to the Property.

61.

Because of its highly-infectious nature, COVID-19 contaminates surfaces and individuals, thus damaging the Property.  COVID-19 can survive on surfaces and objects for hours to days, and droplets that land on surfaces and objects can be transferred by touch. CDC, *Frequently Asked Questions*, accessed November 5, 2020, https://www.cdc.gov/coronavirus/2019-ncov/faq.html.  The CDC has explained, "[r]outine cleaning and disinfecting are an important part of reducing the risk of exposure to COVID-19."  CDC, *Guidance for Cleaning and Disinfecting*, https://www.cdc.gov/coronavirus/2019-ncov/community/pdf/  Reopening_America _Guidance.pdf.  Accordingly, the Plaintiffs were forced to frequently disinfect surfaces and objects touched by multiple people at the insured Property. *Id.*  Pursuant to CDC guidance, the Plaintiffs had to clean and disinfect surfaces frequently touched by multiple people, such as door handles, desks, phones, light switches, and faucets, at least daily." *Id.*  When people present on the insured Property tested positive for COVID-19, those areas were considered contaminated and damaged by the disease.  To address that damage, each of the affected areas had to undergo specific cleaning procedures, which differed depending on the type of room, before the area was deemed safe to use.  A copy of those cleaning requirements is attached hereto as <u>Exhibit 4</u>.

62.

On July 14, 2020, Plaintiffs activated an Emergency Staffing Plan, due to "sustained high COVID-19 and non-COVID-19 patient volumes and an increase positive COVID-19 rate amongst its staff." (*See* Exhibit 2 hereto, at Exhibit 8.) Pursuant to the Emergency Staffing Plan, large portions of the nursing staff of Plaintiffs were reassigned from customary duties to provide additional staffing in the Emergency Department, the Medical Intensive Care Unit and a unit at the Children's Medical Center where COVID-19 patients were treated. As a direct result, Plaintiffs had to pay overtime pay for non-exempt employees and extra duty to exempt employees. As a result, Plaintiffs suffered a loss to their workforce and a financial loss from additional wages that needed to be paid to these workforce members.

63.

Plaintiffs, because of the damage to Property, the actual presence of COVID-19, and the existence of the Civil Authority Orders and Executive Orders, suspended entire service lines, including elective surgery, which is ordinarily one of the most profitable service lines for any large health system. These Orders helped prevent the spread of COVID-19 and channeled resources of Plaintiffs into fighting the COVID-19 pandemic. As a result, however, Plaintiffs were severely limited, restricted and

prohibited access to the entirety of Plaintiffs' facilities.  This resulted in substantial loss on behalf of each of Plaintiffs.

64.

As a result of these decisions, which were necessary because of the actual presence of COVID-19 and various Civil Authority Orders and Executive Orders, Plaintiffs were prevented from generating millions of dollars in earnings they would have received for service lines that were suspended.

65.

Plaintiffs also had to reallocate and utilize extraordinary numbers of resources to fight the COVID-19 pandemic and check its spread within the Property of Plaintiffs.  Patient care providers are required to use personal protective equipment ("PPE") to properly treat patients and prevent the spread of the virus.  (*See* Exhibit 2 hereto, at Exhibit AF.)  Such equipment had to be checked on a daily basis and N95 respirators had to be extensively reprocessed after each use.  *Id.*  Because of the short supply and high demand for such equipment during the early weeks of the pandemic, before an individual's next shift, the respirator had to be reprocessed by utilizing an extensive 21-step process.  *Id.*  This consumed significant cleaning supplies and physical space in the Property of Plaintiffs.

66.

Additionally, the Executive Orders and Officer Orders also required isolation and distancing of individuals which forced the Plaintiffs to prohibit, limit and restrict access to areas of the Property.  To prevent the spread of COVID-19 visitors were prohibited to accompany patients, access to hallways was restricted and family areas were closed.  (*See* Exhibit 2 hereto, at Exhibit S.)  This also resulted in the loss of and the interruption of a substantial portion of Plaintiffs' healthcare services because patients were unwilling or unable to seek treatment at locations of Plaintiffs if they could not be accompanied by family members.

67.

Throughout the COVID-19 pandemic, Plaintiffs had to utilize more physical space per patient to attempt to isolate patients who had come into contact with COVID-19 and maintain the health and safety of non-affected patients.  To prevent the spread or infection of COVID-19, Plaintiffs were forced to physically quarantine patients and staff who may have been exposed to the virus.  Plaintiffs had to prohibit, limit and restrict access to parts of their facilities to the extent those areas contained COVID-19.  This reduction in usable space to create physical distance between patients reduced the numbers of patients who were seen and treated at AUMC and AUMA resulting in business interruption and loss of earnings.

## VIII.  <u>CLEAN-UP COSTS</u>.

68.

The Policy "covers the reasonable necessary costs" for the "clean-up, removal and disposal" of the communicable disease from the Property and the "actual cost of using the Plaintiffs' employees for reputation management" resulting from the presence of communicable disease.

69.

Due to the actual presence of COVID-19 at Property of Plaintiffs, Plaintiffs had to diligently and completely clean the Property on an on-going basis.  To do this, Plaintiffs had to facilitate the cleaning, removal and disposal of COVID-19 through purchasing of cleaning supplies and service costs and had to utilize members of the Plaintiffs' workforce beyond their normally-scheduled hours.

70.

In the First Supplement and Second Supplement, Plaintiffs described in detail these costs.  Plaintiffs provided evidence to AFM of cleaning services costs in excess of $65,000, overtime cleaning services of almost $60,000 and $32,654 in reputation management costs.

71.

In addition to the cleaning costs, cleaning services costs and reputation management costs, Plaintiffs incurred substantial amounts related to costs that were reasonable and necessary because of the actual presence of COVID-19, resulting

31

damage to Property, Officer Orders and Civil Authority Orders related to the state of emergency. These costs through May 2020 included without limitation (a) approximately $4.6 Million in disaster pay that Plaintiffs incurred because of the presence of COVID-19 and the State of Emergency; (b) almost $1.3 Million for expenditures for equipment and renovation to isolate and treat COVID-19 patients, including the purchase of ICU bed systems, renovations to Property of Plaintiffs, Hospira pumps and myriad other necessary equipment because of the existence of COVID-19 and the State of Emergency and (c) other expenditures for protective equipment, disinfection equipment and lab testing equipment and supplies, which amounted to approximately $9.4 Million through May 2020, as set forth in the Second Supplement to the Sworn Statement of Notice of Claim of Proof of Loss, attached hereto as Exhibit 3. These costs continued to dramatically increase through the COVID-19 emergency through the date of filing this Complaint.

## IX.   **ACTUAL PRESENCE OF COVID-19.**

72.

On June 24, 2020, AFM responded to the Sworn Statement and Proof of Loss dated June 10, 2020 and the Supplement also dated June 10, 2020 by rejecting the claims and sending a response letter requesting additional information. Indeed, AFM included a large, bolded Legend stating "Rejected" on each page of the Sworn Statement and the Supplement. (*See* Exhibit 5, hereto.)

32

73.

Notwithstanding the rejection, the June 24, 2020 AFM response letter requested patient information and employee information on an individual basis regarding persons who were inpatients or otherwise patients of the Plaintiffs or who were employees of the Plaintiffs who tested positive for COVID-19.

74.

To the extent that response letter thereby implied that Defendant AFM was uncertain as to whether COVID-19, a communicable disease, was on the Property of Plaintiffs, such a statement was intentionally false.

75.

In the Second Supplement of the Sworn Statement of Notice of Claim of Proof of Loss, Plaintiffs again provided clear evidence of the number of COVID-19 patients treated by Plaintiffs on a daily basis through June 30, 2020.   Such information also established the location of the units in AUMC where each COVID-19 patient was located.  It did so on a daily basis from the beginning of the pandemic through that date.

76.

Plaintiffs also provided as Exhibit G to the Second Supplement a daily census that indicated the number of COVID-19 patients treated in each unit of the hospital and the daily test results for each patient tested for COVID-19 through July 15, 2020.

The presence of COVID-19 at Plaintiffs' properties continued to accelerate through July and August 2020, and through the date of this Complaint.

77.

In addition to the patients treated for COVID-19 at the Property of Plaintiffs, including AUMC's main campus, the actual presence of COVID-19 also was established through the provision of information regarding the number of AUMC employees who tested positive for COVID-19 in each of the months March through June, 2020. That number was subsequently supplemented through August 21, 2020.

78.

Despite this overwhelming evidence, including the Executive Order requiring that AU Health provide COVID-19 testing services, Defendant AFM continued to question and deny the presence of COVID-19 on the Property of Plaintiffs.

79.

On August 4, 2020, AFM responded to Plaintiffs' July 20, 2020 letter. A true and correct copy of that August 4, 2020 correspondence from AFM is attached hereto as Exhibit 6. That letter noted that "our previous correspondence dated June 24, 2020 did reject and return the Sworn Statement and Proof of Loss dated June 9, 2020. We therefore do not have an open Proof of Loss pending at this time.

However, we will continue to work with you to gather the information and documentation we require to complete our review of this claim."

80.

The August 4, 2020 response rejected the claim for property damage even though the Policy itself says that coverage is provided if a described location has the actual presence of communicable disease and access to such described location is limited, restricted or prohibited by an order of an authorized governmental agency or a decision of an officer of the insured as a result of such presence of communicable disease.  In those events, the Policy, as the August 4, 2020 response noted, covers the reasonable and necessary costs for the clean-up, removal and disposal of such presence of communicable disease.  Notwithstanding that plain language, AFM claimed that "we have not been provided with the cause of loss for each location; the type of physical loss or damage that occurred at each location, and when the loss or damage occurred . . . for each location."

81.

In short, AFM claimed:  "The presence of COVID-19 at an insured location does not constitute 'physical damage of the type insured' as required under this provision.  Accordingly, the Policy Civil or Military Authority provision (and other

policy provisions requiring physical loss or damage of the type incurred) do not respond based on the information presented."

82.

This denial of coverage for physical damage was in bad faith and a blatant attempt by AFM to repudiate its contractual obligations under the Policy.

83.

The presence of COVID-19 caused physical damage to the Property, including without limitation:

a. The Policy acknowledges that communicable diseases cause physical damage to property because it includes property damage coverage for loss caused by communicable disease;

b. AFM admitted that communicable diseases cause physical damage to property in its filings to the Georgia Department of Insurance;

c. Plaintiffs evacuated, quarantined, and/or limited access to portions of the Property where COVID-19 was confirmed or suspected;

d. Plaintiffs engaged in sanitization and cleaning efforts to the Property where COVID-19 was confirmed or suspected;

e. Plaintiffs limited access to portions of the Property where patients with COVID-19 were present or where AU considered there to be an elevated risk of the presence of COVID-19;

36

f.    Plaintiffs halted the provision of certain non-COVID-19 services and care at the Property because COVID-19 was present or suspected to be present at the Property;

g.    The presence of COVID-19 limited Plaintiffs' use of the Property; and

h.    COVID-19 can persist on physical surfaces for longer than 24 hours.

84.

The August 4, 2020 correspondence also requested voluminous information that AFM sought in bad faith with respect to the communicable disease and business interruption coverages.

85.

For example, even though Plaintiffs had already provided information respecting the treatment of patients at AUMC on a daily basis who had contracted COVID-19, AFM in bad faith asked Plaintiffs:  "How did you determine that the locations identified above had the actual presence of COVID-19?"

86.

AFM also requested in bad faith individual patient test results which could not be provided under the Health Insurance Portability and Accountability Act of 1996, as amended (HIPAA) and other privacy provisions set forth under state and federal law.

## X.    <u>BAD FAITH CONDUCT OF AFM</u>.

87.

AFM is a subsidiary of FM Global.

88.

AFM in denying the claim of AU Health System and in delaying its adjudication has engaged in a targeted scheme to deny Plaintiffs' claim in bad faith and without justification.

89.

AFM's response to the claim of AU Health System adheres closely to an internal memo that FM Global has distributed to its affiliates, including AFM on information and belief, entitled "Talking Points on the Novel 2019 Coronavirus."  A copy of those talking points is attached hereto as <u>Exhibit 7</u>.

90.

The talking points erroneously provide that the coverages in the AFM Policy for civil or military authority, supposedly do not apply because "[a] virus will typically not cause physical damage" and because "the presence of a communicable disease does not constitute physical damage and is not of the type insured against." (*See* Exhibit 7 hereto, at p. 2.)

38

91.

However, this position is in contradiction to the explicit Policy language respecting civil and military authority and Officer Order coverages.

92.

As a result of the bad faith of AFM in following the policy position of FM Global, AFM purported to deny the claim for costs associated with the civil and military authority coverage, which are in excess of $9 Million.

93.

Moreover, the Policy explicitly acknowledges that the presence of communicable disease causes physical damage to property because it provides coverage for the resulting "clean up, removal and disposal of the communicable disease.

94.

The talking points specifically provide that the business interruption coverage is triggered by the actual presence of persons with communicable disease at locations of persons insured by a policy like AFM sold to Plaintiffs.

95.

Notwithstanding the specific directive, AFM in bad faith has delayed and denied coverage to Plaintiffs for business interruption coverage claiming that it cannot validate the fact that there was the presence of communicable disease within

AU Health System.  That position is in blatant bad faith given the hundreds of COVID-19 patients that AU Health System has treated and given the voluminous data that AU Health System provided with respect to such patients.

96.

The position that AFM has taken respecting coverage for Plaintiffs' claims also expressly contradicts filings and certifications that AFM made to the Georgia Department of Insurance respecting the presence and spread of communicable disease.

97.

In 2015 AFM filed a "Healthcare Endorsement" with the Georgia Department of Insurance.  The Healthcare Endorsement provided as follows:  "For the purpose of this coverage, the presence and spread of communicable disease will be considered direct physical damage and the expenses listed above will be considered expenses to repair such damage." (See "PRO HC 4100 Healthcare Endorsement" p. 1, attached hereto as Exhibit 8.)

98.

In 2016, AFM expanded this coverage again.  AFM filed with Georgia a certification that it was removing this provision from the specific HC Endorsement, adding it to the Core All-Risk Policy, renaming it "Communicable Disease – Property Damage.  AFM stated that any grammatical/editorial changes to the

coverage was for clarification only and was intended to result in an overall expansion

in coverage.   To that end, in an explanatory Memo filed with the Georgia

Department of Insurance, AFM represented as follows:

> Communicable Disease – Property
>
> This coverage was previously approved as Communicable Disease
> Cleanup, Removal and Disposal in Form PRO HC 4100 (04/15), Filing
> AFM-2015-1.  The coverage was previously available to insureds with
> healthcare occupancies only and now is core coverage.  Grammatical
> and editorial changes have been made for clarification.  The coverage
> also now allows for an officer of the Insured to trigger the coverage and
> notice has been added that a waiting period applies.  This is an overall
> expansion in coverage.

A true and correct copy of that Explanatory Memorandum is attached as Exhibit 9.

99.

Therefore, AFM's own sworn filings to the Georgia Department of Insurance

establish that the presence of communicable disease establishes property damage for

purposes of the Policy.  These sworn filings expressly contradict the position AFM

has made with respect to Plaintiffs' claims.  These sworn filings underscore the bad

faith nature of the AFM's claim denial.

100.

AFM has waived any argument and/or is estopped from arguing that the

presence of COVID-19 does not cause physical damage to property.

41

101.

AFM also continuously sought to require identification of patients and employees who tested positive for COVID-19 even though nothing in the Policy would require any such identification of individual persons.  AFM's position was taken solely to delay and deny the valid business interruption claim of Plaintiffs.

102.

Pursuant to O.C.G.A. § 33-4-6, if an insurer refuses, in bad faith, to pay an insured loss within sixty (60) days after a demand has been made, "the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer."  The Plaintiffs made such a demand to AFM on September 2, 2020 when counsel for Plaintiffs submitted correspondence to AFM demanding payment and indicating, among other things, that its failure to pay the claim of Plaintiffs would result in Plaintiffs bringing a claim for bad faith denial of coverage under the Policy.  A true and correct copy of that correspondence is attached hereto as Exhibit 10.

103.

On October 29, 2020, AFM responded to the September 2, 2020 correspondence.  A true and correct copy of that correspondence is attached hereto as Exhibit 11.

42

104.

In that correspondence, AFM denied that Plaintiffs had provided sufficient proof of the existence of any Officer Orders or Civil Authority Orders that had interrupted any business of Plaintiffs.

105.

In that correspondence, AFM also denied that Plaintiffs had provided sufficient proof of the existence of COVID-19 at the business locations of Plaintiffs. AFM demanded that Plaintiffs provide positive test results for employees and patients of Plaintiffs who had COVID-19 at Plaintiffs' locations.

106.

Finally, although AFM stated that certain communicable disease coverages under the Policy might theoretically exist, it again contended it did not have sufficient information to evaluate or approve any claim whatsoever. It also contended that an unrelated "contamination" provision barred many or all of Plaintiffs' claims under the Policy.

107.

This response mirrored again the position that AFM staked out early in the pandemic to deny any such claims, as reflected in Exhibit 7.

108.

These actions again were in bad faith, and the sixty (60) day notice period that Plaintiffs gave on September 2, 2020 to AFM has now passed.

## COUNT I – DECLARATORY JUDGMENT

109.

Plaintiffs incorporate by reference as if fully set forth herein their allegations in Paragraphs 1 – 108 of the Complaint.

110.

A justiciable controversy exists between Plaintiffs and AFM regarding the availability under the coverage for Plaintiffs' claims.

111.

Accordingly, Plaintiffs seek a declaration from the Court that the claims of Plaintiffs outlined herein are covered by the Policy.

## COUNT II – BREACH OF CONTRACT

### Property Damage

112.

Plaintiffs incorporate by reference as if fully set forth herein their allegations in Paragraphs 1 – 108 of the Complaint.

113.

COVID-19 has caused and is continuing to cause physical loss and damage to Plaintiffs' Property.

114.

Access to Plaintiffs' Property has been limited because of various Officer Orders and Civil Authority Orders.

115.

No exclusions apply to bar coverage for Plaintiffs' claim for physical loss and damage to Plaintiffs' Property.

116.

The Policy is a binding contract of insurance between the Plaintiffs and AFM. AFM has breached the Policy by refusing to pay for Plaintiffs' physical loss and damage pursuant to the Policy.  (*See* Policy, Sec. B.1, p. 20 of 44; D.5, p. 7 of 44; E.2, p. 24 of 44; E.3, p. 25 of 44.)

117.

Plaintiffs have suffered and continue to suffer damages in an amount in excess of $75,000 to be proven at trial as a result of AFM's breach of the Policy.

118.

Plaintiffs are entitled to damages as a result of AFM's breach in an amount to be determined at trial, including pre-judgment interest and such other costs and relief as may be appropriate.

## COUNT III – BREACH OF CONTRACT

### Business Interruption

119.

Plaintiffs incorporate by reference as if fully set forth herein their allegations in Paragraphs 1 – 108 of the Complaint.

120.

As set forth above, AFM agreed to cover business interruption loss as provided in the business interruption coverage.

121.

Plaintiffs are entitled to coverage for their business interruption losses and incurred extra expenses related to COVID-19 up to the Policy's current limits of liability for business interruption losses.

122.

AFM has breached its obligation under the Policy by failing to pay for business interruption losses.

46

123.

As a result of AFM's conduct, Plaintiffs have incurred damages in excess of $75,000 in business interruption losses in amount to be proven at trial, which damages continue to accrue.

124.

Plaintiffs are entitled to these damages and such other further amounts as to be determined at trial.

125.

Plaintiffs have complied with all applicable Policy provisions, including paying premiums and provided timely notice of this Claim, or such Policy provisions have been waived.

## COUNT IV – BAD FAITH

## O.C.G.A. § 33-4-6

126.

Plaintiffs incorporate by reference as if fully set forth herein their allegations in Paragraphs 1 – 108 of the Complaint.

127.

On September 2, 2020, Plaintiffs made a written demand for payment in accordance with O.C.G.A. § 33-4-6.  (*See* Exhibit 10 hereto.)

128.

The Plaintiffs made demand for payment made more than sixty (60) days prior to filing this Complaint.

129.

AFM has refused to pay Plaintiffs' claim.

130.

As described above, AFM refused to pay Plaintiffs' claim in bad faith.

131.

Plaintiffs have sustained damages due to the physical presence of COVID-19, the existence and ongoing threat of COVID-19, and various Civil Authority Orders and Officer Orders issued as a result of the actual presence of COVID-19, but AFM has failed to comply with its contractual obligations and has failed to pay Plaintiffs for their Claim.

132.

Plaintiffs are entitled to compensatory damages plus fifty percent (50%) of the liability of the AFM for the loss incurred by Plaintiffs, along with their reasonable attorneys' fees and expenses, due to the bad faith of AFM.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request as follows:

(1)     That the Court empanel a jury to hear the claims set forth in this Complaint;

(2)     That the Court enter judgment in favor of Plaintiffs on each of the Counts of the Complaint;

(3)     That the Court enter judgment in favor of Plaintiffs for the actual losses suffered by Plaintiffs that are covered by the Policy that AFM has failed and refused to pay;

(4)     That the Court declare that coverage exists for each of the claims made by Plaintiffs under the Policy;

(5)     That judgment be entered in favor of Plaintiffs on their bad faith claim against AFM resulting in an additional award of fifty percent (50%) of the losses of Plaintiffs along with their reasonable attorneys' fees and costs;

(6)     That the Court award Plaintiffs their reasonable attorneys' fees and costs; and

(7)     That the Court award Plaintiffs for such other and further relief that the Court deems just and proper.

*[Signature on Next Page]*

Respectfully submitted this 4th day of February, 2021.

MORRIS, MANNING & MARTIN, LLP


Robert C. Threlkeld
GA Bar No. 710760
Elliott L. Coward
GA Bar No. 523774
MORRIS, MANNING & MARTIN, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Tel:  (404) 233-7000
Fax:  (404) 365-9532
rct@mmmlaw.com
ecoward@mmmlaw.com

*/s/ Edgar D. Bueno*
Edgar D. Bueno
GA Bar No. 363916
MORRIS, MANNING & MARTIN, LLP
24 Drayton Street
Suite 712
Savannah, Georgia 31401
Tel:  (912) 232-7182
Fax:  (912) 232-7184
ebueno@mmmlaw.com

*Attorneys for AU Health System, Inc.,*
*AU Medical Center, Inc. and AU*
*Medical Associates, Inc.*